UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Yoona Ha, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:14-CV-00895 |
| | ) | |
| v. | ) | |
| | ) | Honorable Harry D. Leinenweber |
| Northwestern University, | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| Defendant. | ) | Jury Trial Demanded |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, Yoona Ha, through her attorneys, O'Connor | O'Connor, P.C., by Kevin F. O'Connor, and, as for her First Amended Complaint against the Defendant, Northwestern University, alleges and shows to the Court, as follows:

## NATURE OF ACTION

1. Plaintiff Yoona Ha ("Ha") brings this action under Title IX of the Education Amendments of 1972 to redress the unlawful discrimination and retaliation by Defendant Northwestern University ("Northwestern') after she reported sexual harassment committed by Defendant Northwestern's employee Professor Peter Ludlow.

2. Specifically, Plaintiff seeks to be made whole for the damage caused by Defendant Northwestern University's deliberate indifference and retaliation in handling her sexual assault complaint, including, but not limited to the full payment of her medical bills accrued and future medical bills; waiver and/or reimbursement of her tuition; compensation for her emotional distress; proper remedial actions regarding her claim, and attorney fees she has incurred.

## JURISDICTION AND VENUE

3. Plaintiff brings this action pursuant to Title IX of the Education Amendments of 1972, Section 901(a), as amended, U.S.C. Section 1681 (a) ("Title IX"). This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

4. Venue is proper under 28 U.S.C. 1391(b) because the events giving rise to the claims alleged herein occurred within the Northern District of Illinois.

## GENERAL FACTUAL ALLEGATIONS

5. Plaintiff Yoona Ha is an adult female and is a junior majoring in journalism at Defendant Northwestern University. She also works for Defendant Northwestern University under a work-study program.

6. Defendant Northwestern University is an institution of higher education duly organized and existing under the laws of the State of Illinois which received federal financial assistance for its education program.

7. In the fall quarter of her freshman year, Plaintiff took "Philosophy of Cyberspace" taught by Peter Ludlow ("Ludlow"). He is a tenured professor at the Department of Philosophy and is employed by Defendant Northwestern.

8. Philosophy of Cyberspace was about ethical and moral considerations one in a virtual world and exploring the philosophical meanings of what is considered 'real life' and what is considered 'virtual life'. To teach this class, Ludlow used "Second Life," which is an internet based program where users can interact in a virtual world using a software based

     avatar. Ludlow would show videos of virtual characters having sex to the students during classes.

9. Plaintiff always kept her interactions and communications with Ludlow professional.

10. On or about February 8, 2012, Plaintiff learned of an art event in Chicago which was related to Ludlow's field of research and interest. Plaintiff emailed Ludlow information on the event and suggested he should attend.

11. The same day, Ludlow emailed Plaintiff back and then asked her to come to the event with him. Plaintiff agreed.

12. On or about February 10, 2012, Ludlow asked Plaintiff to meet with him at his office so that they could drive to the event together. Ludlow and Plaintiff drove in Ludlow's car to Columbia College in Chicago to see one of the exhibits which was part of the art event.

13. Afterwards, they went to a restaurant. Ludlow ordered wine for Plaintiff. Plaintiff repeatedly stated that she was underage and she did want to drink, but Ludlow insisted that she drink. Ludlow said he would "cover for her" if the restaurant asked her ID.

14. Ludlow stated that he personally knew two of the women who were curating the exhibits that they were going to, and that he had a sexual relationship with both women, and one of them used to be a prostitute.

15. On the way to other exhibits of the art event, Ludlow told Plaintiff that he needed to go to a bar for more drinks. At the bar, Ludlow again insisted that Plaintiff drink and ordered a beer for her. At this point, Plaintiff was under the influence of alcohol, and asked Ludlow to take her back to Evanston, which he refused. Instead, he told Plaintiff that they should "party together."

3

16. Instead of taking Plaintiff to Evanston, Ludlow took her to a different exhibit. Then he started to take pictures of Plaintiff, which made her very uncomfortable, and she started to feel afraid.

17. Plaintiff again reiterated that she needed to go back to Evanston when they got out of the exhibit. Ludlow instead took her to a warehouse for another art performance. At this point, Plaintiff was disoriented from the alcohol and did not know where she was. During the performance, Ludlow slouches in a way that his back was touching Plaintiff's.

18. Afterward, Ludlow told Plaintiff that he needed to stop by his apartment to drop something off. He continued to disregard Plaintiff's renewed requests to take her to the Evanston Campus. He also insisted that Plaintiff go up to his apartment with him.

19. When they were in Ludlow's apartment, he again insisted strongly that she drink, which Plaintiff did. Ludlow started to talk about his sex life and to inquire as to Plaintiff's sexual relationships. Plaintiff felt uncomfortable and requested to leave the apartment.

20. Ludlow took her to a bar and again urged her to drink. It was now around midnight of February 11, 2012 and at this point, Plaintiff was already very drunk. Ludlow commented on how attractive Plaintiff was and started to rub her back and kiss her at the bar. Plaintiff was too intoxicated to put up any meaningful resistance to Ludlow's unwelcome advances. Ludlow also asked if Plaintiff wanted money and stated that they should continue to see each other.

21. Plaintiff's degree of intoxication by this time caused her memory of events to fade in and out, it is likely that at around this time, she went in and out of consciousness as well. At

4

some point she found herself outside of the bar and sitting down in the snow. Ludlow tried to drag her into another bar.

22. When Plaintiff gained her consciousness again, she was in an elevator going up to Ludlow's apartment, with Ludlow furiously making out with Plaintiff.

23. Plaintiff begged Ludlow to stop, but he groped her breast and buttocks, and told Plaintiff that it was "inevitable" that they would have sex. Plaintiff's next recollection was when she woke up at around 4:00 am in Ludlow's bed. Ludlow was in bed with her, and his arms were around her. She panicked and blacked out.

24. Ludlow dropped Plaintiff off at Evanston around noon on February 11, 2012 and told her that he was looking forward to seeing her again and kissed her again.

25. On or about February 12, 2012 Plaintiff told one of her professors about the incident with Ludlow.

26. After reporting the sexual assault by Ludlow to the professor, Plaintiff confronted Ludlow and Ludlow begged Plaintiff not to tell anyone, and told her that he could mentor her academically or pay her money.

27. The Director of Sexual Harassment Prevention, Joan Slavin, was informed by a faculty member that Plaintiff had complained about Ludlow's conduct and began to interview at least some of the people with knowledge about what had occurred.

28. On or about February 13, 2012, Plaintiff was hospitalized after attempting to commit suicide as a result of the stress and trauma of the events with Ludlow. She was diagnosed with Post Traumatic Stress Disorder (PTSD), which requires ongoing psychiatric care. She was released from the hospital on or about February 16, 2012.

29. On or about April 11, 2012, Ms. Slavin, the Director of Sexual Harassment Prevention emailed Plaintiff regarding the findings of the investigation. Based on the totality of the evidence, Ms. Slavin concluded that Ludlow engaged in unwelcome and inappropriate sexual advances toward Plaintiff on the evening of February 10-11, 2012. In particular, Ms. Slavin found that Ludlow initiated kissing, French kissing, rubbing Plaintiff's back, and sleeping with his arms on and around Plaintiff on the night of February 10-11, 2012. She also found that "you [Ms. Ha] were incapacitated due to heavy consumption of alcohol purchased for you by Respondent [Ludlow], and were therefore unable to offer meaningful consent to this physical touching that night". I also find that Respondent told you he thought you were attractive, discussed his desire to have a romantic and sexual relationship with you, and shared other personal information of a sexual nature, all of which was unwelcome to you."

30. However, Ms. Slavin, for some reason, did not find that Ludlow touched Plaintiff's breasts and buttocks.

31. Ms. Slavin said that she made the Weinberg Dean's Office aware of her findings, and would work with that office on implementing needed corrective and remedial actions. However, she told Plaintiff that Defendant Northwestern would not share details of disciplinary and corrective actions taken against Ludlow because of its confidential personnel nature.

32. In or around April 2012, Plaintiff retained attorneys to represent her with the matters related to Ludlow's sexual assault against her. Plaintiff was referred to her attorneys by

6

one of Defendant Northwestern's employees who had been working with her regarding Plaintiff's sexual harassment incident.

33. After the investigation was concluded, Plaintiff found out that Ludlow was still on campus and was informed by a faculty member that Ludlow's name was on the syllabus of the courses for next quarter.

34. When the next quarter started, Plaintiff kept running into Ludlow in hallways and outside of the campus buildings. After knowing that Ludlow was not removed from the campus, Plaintiff felt extremely unsafe and experienced panic attacks, difficulty breathing, and nausea. Her attacks were so severe that Plaintiff could not even leave her house. Plaintiff reported the attacks she experienced to faculty members at numerous times.

35. In one instance, Plaintiff encountered Ludlow on the way to a discussion section meeting of a political science course in the beginning of the quarter. After running into Ludlow the first time, Plaintiff missed three discussion meetings for that course to avoid the possibility of running into Ludlow again. Her anxiety became severe when the teaching assistant of the course warned Plaintiff that she needed documentation to have her absences excused. Plaintiff either had to be forced to reveal the sexual assault she experienced or had to have unexcused absences for the course which would negatively impact her academic record.

36. After these encounters with Ludlow, Plaintiff, through her attorney at that time, inquired as to whether Ludlow would be removed from the campus based on the findings of the investigation. The attorney also asked Defendant Northwestern to provide Plaintiff all the

information possible so that she could at least engage in safety planning and determine the best way to fulfill her academic requirements.

37. Defendant Northwestern, through its counsel, confirmed that Ludlow had not been removed from the campus and reiterated that it would not disclose the details of any disciplinary actions taken against Ludlow.

38. On or about April 24, 2012, Plaintiff, through her counsels, sent out a demand letter to Ludlow setting forth his legal liabilities and requesting Ludlow pay Plaintiff's damages caused by his sexual assault. On or about May 4, 2012, Ludlow, through his attorney, denied the allegation of sexual assault, and accused Plaintiff of making false statements about Ludlow. Ludlow threatened to sue Plaintiff for defamation per se and "ordered" Plaintiff immediately cease and desist from making any further "false" statements about Ludlow.

39. Plaintiff reported this incident to Ms. Slavin because in the email she sent to Plaintiff in April 11, 2012, she had advised Ludlow "to avoid any behavior whatsoever that could be construed as retaliation against Plaintiff, now or in the future, for bringing the complaint," and Plaintiff believed that the threat of lawsuit was retaliatory and was being used to silence her from raising her legitimate concerns regarding Ludlow.

40. Plaintiff was told that it was not retaliation and Defendant Northwestern did not take any action regarding the threatening letter Ludlow sent to Plaintiff.

41. On or about March 4, 2013 Plaintiff was put on early release because her mother in California developed health problems that required immediate medical attention. The health problems were caused by extreme emotional distress she had experienced due to

8

her daughter's incident with Ludlow and the subsequent mishandling of the incident by Defendant Northwestern. Plaintiff's mother felt helpless and depressed with the situation her daughter was in, and the fact that nothing was resolved at Northwestern. Plaintiff continued to see a psychiatrist while staying in California.

42. Even after coming back to school after the leave, Plaintiff could not handle the full-time course load.

43. During fall quarter of 2012-2013 academic year, Plaintiff applied for a research fellowship. The fellowship committee was very impressed with Plaintiff. However after revealing her incident with Ludlow and her ongoing battle with anxiety and panic attacks to an employee working in the President's Office, she was denied of the fellowship without any explanation. A tenured professor inquired on Plaintiff's behalf for the reason of the denial, but the inquiry was ignored.

44. Frustrated by Defendant Northwestern's inaction and its refusal to discuss any aspects of disciplinary action against Ludlow, Plaintiff retained different attorneys to represent her in May 2013.

45. Plaintiff, through her attorneys, again inquired as to the disciplinary and remedial action taken against Ludlow, but Defendant Northwestern refused to discuss the matter because it is a "private" matter and insisted that it did "everything" it could do.

46. Plaintiff had initially required psychological care after being sexually assaulted by Ludlow. Her medical condition became more severe after encountering Ludlow on campus. Because of Defendant Northwestern's failure to take preventative and remedial measures after the assault, Plaintiff's condition continued to worsen. She needs

9

psychiatric care and prescription medication to control her severe PTSD, and still must face daily the possibility that Ludlow may be near her at any moment.

47. Plaintiff's medical conditions were/are so severe and pervasive that they interfere with her ability to be successful academically. She had to withdraw from most of the classes she had enrolled and even had to cancel a study abroad program she intended to participate in due to the need of continued psychiatric support.

48. When Plaintiff dropped out of the study abroad program, she was informed by Defendant Northwestern that she did not need to pay any money for the study abroad program. However, contrary to Defendant's assurance, the company in charge of study abroad program sent Plaintiff an invoice and continues to attempt to collect on it to this date.

49. On or about April 24, 2012 Plaintiff registered for a disability service so that she does not need to explain her absences from classes.

50. In or around September 2013, Defendant Northwestern's advocacy center for sexual assault victims, the Center for Awareness, Response, and Education ("CARE") decided to stop working with Plaintiff, quoting "conflicts of interest." This happened shortly after Plaintiff, through attorneys, contacted Defendant Northwestern's General Counsels and demanded Defendant take action to remedy damages suffered by Plaintiff from Defendant's violation of Title IX.

51. After filing the lawsuit against Defendant Northwestern on February 10, 2014, Plaintiff experienced inconvenience and difficulties at the hands of Defendant. For example, on or about March 3, 2014, less than a month after Plaintiff filed the lawsuit, Plaintiff found out that she was not automatically registered for a class, despite the fact that every journalism

student was supposed to be registered automatically. Due to this, Plaintiff almost missed out taking on the class. The issue was resolved only after Plaintiff angrily complained to an administration.

### COUNT I : Violation of Title IX of the Education Amendments of 1972

52. Paragraphs 1 through 51 are hereby restated and realleged as if fully set forth in Count I.

53. Defendant Northwestern University receives federal financial assistance for its education program. Therefore, Defendant Northwestern is subject to the provisions of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (a), *et seq.*

54. Defendant owes a duty to Plaintiff to provide and ensure an educational environment free of sex discrimination and sexual harassment, and to enforce the regulations, rules, and laws necessary to protect Plaintiff from acts of sex discrimination and sexual harassment.

55. Ludlow, an employee of Defendant, willfully subjected Plaintiff to unwanted and unwelcomed sexual advances, intimidation, statements, and other conduct that was of a sexual nature. Plaintiff was subjected to this treatment because of her sex.

56. Defendant's own investigation yielded a finding that Ludlow's conduct toward Plaintiff violated Defendant's Policy on Sexual Harassment.

57. Defendant knew that Plaintiff's PTSD became more severe after Plaintiff continued to encounter Ludlow on campus, and that the possibility of such continued encounters in the future put Plaintiff under severe distress, anxiety, and panic attack.

58. Ludlow's assault on Plaintiff, Ludlow's presence on campus, her encounter with him after the assault, and the accompanying risk that she would encounter Ludlow in the

11

future created a hostile environment that effectively deprived her of the educational opportunities and benefits provided by the school.

59. Despite Plaintiff's repeated requests to discuss remedial actions against Ludlow so that she could conduct herself safely while on campus and so that she could finish her education without any disruption, Defendant refused to discuss the matter with Plaintiff and just parroted back that it 'did comply with the requirements of Title IX'.

60. While Plaintiff continuously suffered from anxiety and distress due to Ludlow's presence on campus, which compromised her education at Defendant Northwestern, Defendant did not take any meaningful action to remedy the situation.

61. In the original Complaint filed by Plaintiff, it was alleged that: "Upon information and belief, at one point, a committee was established to determine what action should be taken against Ludlow for his sexual assault against Plaintiff. The committee determined that Ludlow should be terminated. Defendant Northwestern ignored its own committee's decision and recommendation and continues to employ Ludlow as a professor."

62. After the original Complaint was filed, Defendant Northwestern sent a correspondence to Plaintiff's counsel on February 13, 2014. That correspondence claimed that the committee referred to in the foregoing paragraph did not issue a written decision in which it recommended that Ludlow's employment be terminated. Attached to Defendant's February 13 correspondence was a document that was purported to be a copy of the July 10, 2012 "Report of the Committee on Cause" regarding the proposed sanction of Professor Peter Ludlow.

63. The Committee on Cause had apparently been convened to review the Dean's actions with respect to Ludlow because Ludlow had appealed it, and because he was of the position that even the insignificant degree of corrective action Dean Sarah Mangelsdorf had taken in response to Ms. Slavin's findings- was unjustified.

64. Upon information and belief, the Committee on Cause, and/or its individual members, had questioned why Ludlow had not been terminated, and that the Committee and/or its individual members were of the position that termination of Ludlow was warranted and appropriate.

65. Defendant failed to take sufficient and meaningful corrective and remedial action, and actively took retaliatory action against Plaintiff, and as a result of Defendant's deliberate indifference, Plaintiff has been and continues to be subjected to an intimidating, hostile, offensive, and intolerable educational environment.

66. By the actions described above, Defendant Northwestern retaliated and further discriminated against Plaintiff after she brought sexual harassment complaint against Ludlow, and repeatedly requested that Defendant take meaningful corrective and remedial action.

67. By the actions described above, Defendant Northwestern University acted to deprive Plaintiff of her rights to be free from discrimination in education on the basis of her sex as provided by Title IX.

68. Plaintiff has suffered and will continue to suffer humiliation, mental and emotional anguish, anxiety, and distress as a result of the hostile educational environment created and maintained by Defendant and its deliberate indifference.

**WHEREFORE**, Plaintiff prays for actual and compensatory damages, pre- and post-judgment interest, attorney's fees, punitive damages, costs associated with this litigation, and any other relief that this Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted by:

Yoona Ha

By: /s/ Kevin F. O'Connor
One of Her Attorneys

Kevin F. O'Connor
O'Connor | O'Connor, P.C.
ARDC / Bar #: 6300449
110 E. Schiller St., Ste. 306
Office Phone:  630-903-6397
Direct Line:    630-456-1596
Fax: 630.658.0336
Email: kevin@oconnor-oconnor.com